IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERT FLETCHER, | ) | 7:05CV5024 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| BROWN COUNTY, CHERRY | ) | |
| COUNTY, DAVID STREICH, in his | ) | |
| official & individual capacity, ERIC | ) | |
| SCOTT, in his official & individual | ) | |
| capacity, STEVE HAPNER, in his | ) | |
| official & individual capacity, and | ) | |
| JOE KREYCIK, in his official & | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Defendants' Motions for Summary Judgment. (Filing Nos. 200 and 204.)  Also pending before the court is Plaintiff's Motion for Summary Judgment (filing no. 247) and Defendants' Motion to Strike Index of Evidence (filing no. 252).

## *PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

Plaintiff recently filed a Motion for Summary Judgment, Brief in Support, and Index of Evidence.  (Filing Nos. 247-48 and 251.)  Over the pendency of this case, Plaintiff sought, and was granted, no fewer than four lengthy extensions of time in which to complete very limited discovery regarding issues related to qualified immunity.  (*See* Filing Nos. 136, 149, 207, 210, 220, 237, and 246.)  In its last Memorandum and Order, the court informed Plaintiff that he had until October 24,

2007 in which to complete limited discovery.[1]  (Filing No. 246.)  Plaintiff was also informed that the deadline for filing his response to Defendants' Motions for Summary Judgment was November 9, 2007.[2]  Plaintiff was specifically warned that "**[n]o further extensions of these deadlines will be permitted.**"  (*Id.*, emphasis in original.)

Despite this warning, and a nine-month extension of time, Plaintiff did not file an opposition or other response to Defendants' Motions for Summary Judgment. Rather, nearly a year after the original deadline and three months after the extended deadline expired, Plaintiff filed a Motion for Summary Judgment and Brief in Support.  (Filing Nos. 247-48.)  The majority of Plaintiff's Motion and Brief in Support discusses claims by individuals who are no longer plaintiffs in this matter. Further, Plaintiff's Motion and Brief in Support relate almost entirely to actions taken by defendants who were dismissed from this action nearly two years ago, and to events which are not included in Plaintiff's Second Amended Complaint. Importantly, Plaintiff does not address the issues raised by Defendants in their Motions for Summary Judgment.  Plaintiff's Motion for Summary Judgment is therefore untimely and almost entirely irrelevant.

In addition, Plaintiff's Brief in Support does not include pinpoint citations to documents included in his Index of Evidence, but generally cites to a deposition with no page reference.  Plaintiff apparently expects the court to read more than 1,000 pages of deposition testimony and other documentation he submitted in order to determine what, if anything, supports Plaintiff's arguments.  The court will not undertake such a task.  This is particularly true where, as here, Plaintiff's Index of

---

[1]The original deadline for completing the limited qualified immunity discovery was January 8, 2007.  (Filing No. 108.)

[2]The original deadline for filing Plaintiff's response to Defendants' Motions for Summary Judgment was March 8, 2007.  (Filing No. 108.)

Evidence is also not authenticated by affidavit, as required by the court's Local Rules, and is therefore largely inadmissible.   NECivR 7.1(b)(2)(C); *see also Stuart v. General Motors Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents which do not meet those requirements cannot be considered.").

The court must liberally construe a pro se plaintiff's pleadings.  *Burke v. North Dakota Dept. of Corr. and Rehab.*, 294 F.3d 1043, 1043-1044 (8th Cir. 2002). However, a pro se plaintiff must "comply with all local rules . . . and with the federal rules of procedure." NEGenR 1.3(g).  Plaintiff's Motion for Summary Judgment and supporting documents do not comply with the Federal Rules of Civil Procedure or the court's Local Rules.  Plaintiff has repeatedly been informed and reminded of his obligation to comply with the rules.  In light of these facts, Plaintiff's Motion for Summary Judgment, Brief in Support and Index of Evidence are stricken and will not be considered.[3]

## *DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

## I.   BACKGROUND

Plaintiff Robert Fletcher ("Fletcher") filed his Complaint in this matter on October 24, 2005.  (Filing No. 1.)  Plaintiff later sought leave to file an Amended Complaint (filing no. 65), but the record is unclear regarding whether Plaintiff's Amended Complaint was ever filed.  Regardless, on June 29, 2006, Plaintiff filed, this time through retained counsel, his Second Amended Complaint.  (Filing No. 80.)  The

---

[3]Defendants' Motion to Strike Index of Evidence (filing no. 252) is granted to the extent that it is not inconsistent with this Memorandum and Order.

3

Second Amended Complaint is the operative complaint in this matter and supersedes all previous complaints. Generally, the Second Amended Complaint alleges violations of Fletcher's constitutional rights stemming from several child abuse investigations undertaken by Defendants. (*See generally*, Filing No. 80.)

After engaging in discovery, Defendants David Streich, Steve Hapner, and Brown County ("Brown County Defendants") and Defendants Eric Scott, Joe Kreycik, and Cherry County ("Cherry County Defendants") filed Motions for Summary Judgment. (Filing Nos. 200 and 204.) Along with their Motions, the Brown County and the Cherry County Defendants each filed a Brief in Support and an Index of Evidence. (Filing Nos. 201-202 and 205-206.) Despite numerous and lengthy extensions of time in which to conduct additional discovery and respond to Defendants' Motions, Fletcher did not file an opposition or other response to Defendants' Motions.

The Federal Rules of Civil Procedure and the court's Local Rules require that evidence in support of a motion for summary judgment be "authenticated by affidavit." NECivR 7.1(b)(2)(C); *see also Stuart v. General Motors Corp.*, 217 F.3d 621, 636 n.20 (8th Cir. 2000) ("To be considered on summary judgment, documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents which do not meet those requirements cannot be considered.").

Additionally, the party seeking the entry of summary judgment in its favor must set forth "a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law." NECivR 56.1(a)(1). If the nonmoving party opposes the motion, that party must "include in its [opposing] brief a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). Such response must

4

"address each numbered paragraph in the movant's statement" of facts and must contain pinpoint citations supporting the opposition. *Id.* "Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response." *Id.*

The court has carefully reviewed the documents submitted by all parties. While Defendants submitted statements of material facts in accordance with the court's rules, Fletcher has not. Further, Defendants submitted evidence which was properly authenticated by affidavit or through sworn deposition testimony. Fletcher did not submit any response to Defendants' Motions. However, he did submit more than 1,000 pages of documentation, which is not properly authenticated even when construed liberally, as set forth above. On the whole, Fletcher's evidentiary submissions to the court do not constitute admissible evidence and certainly are not a "concise response to" Defendants' statements of material facts. Although the court must construe a pro se litigant's pleadings liberally, documents which do not comply with the Federal Rules of Civil Procedure and this court's Local Rules may not be considered. In light of this, the court adopts the following undisputed material facts, the majority of which were set forth by Defendants.

## II.   RELEVANT UNDISPUTED FACTS

The Brown County Defendants

1.   Steven Hapner ("Hapner") is the Sheriff of Brown County, Nebraska and has served as the Brown County Sheriff since January 9, 2003. (Filing No. 202, Attach. 1, at CM/ECF p. 1.)[4]

---

[4]All "attachment" citations in this section are to Filing No. 202, the Brown County Defendants' Index of Evidence.

5

2.     Hapner became certified as a law enforcement officer in the State of Nebraska in October, 1980, after he completed training at the Law Enforcement Training Center in Grand Island, Nebraska. (*Id.*)

3.     Prior to his election as Brown County Sheriff, Hapner served as the Chief Deputy Sheriff of the Brown County Sheriff's Office from March 16, 1988. (*Id.*)

4.     As the Brown County Sheriff, Hapner is responsible for the administration and supervision of the Sheriff's Office, the enforcement of criminal laws in Brown County, and applicable city ordinances. This includes conducting criminal, juvenile and accident investigations, and the service of civil process and execution of other civil proceedings.  (*Id.*)

5.     All law enforcement officers employed by the Brown County Sheriff's Office are required to be trained at the Nebraska Law Enforcement Training Center and become certified within one year of their employment. The officers receive initial training at the Training Center and continuing education on their duties and responsibilities on an annual basis, as it is available.  (*Id.* at CM/ECF pp. 1-2.)

6.     The Brown County Sheriff's Office has a manual that sets out the general policies and procedures of the Office. The members of the Sheriff's Office are guided in their conduct by their training, the policy and procedure manual, and Nebraska law. (*Id.* at CM/ECF p. 2.)

7.     David Streich ("Streich") is the Brown County Attorney and has held this position since December 1, 1987. (Attach. 2, at CM/ECF p. 1.)

8.     Streich views it as his responsibility to make sure that legal actions are taken by his office when necessary to protect children when he has been provided

with a reasonable basis for concluding that it is necessary to take legal protective action on behalf of a minor child, while at the same time taking into account the constitutional and statutory rights of the child's parent, guardian, or custodian. (*Id.* at CM/ECF p. 3.)

9.    Streich does not authorize or direct law enforcement officers or Nebraska Department of Health and Human Services ("NDHHS") personnel, nor has he done so in the past, to engage in searches of private property in violation of the Fourth Amendment to the U.S. Constitution. (*Id.*)

10.    It is the policy of the Brown County Attorney's office to file actions when authorized by the Nebraska Juvenile Code to obtain the jurisdiction of the juvenile court over children who fall within the provisions of §43-247, and to seek the removal of children who are endangered in their homes through appropriate legal proceedings as authorized by Nebraska law. (*Id.*)

11.    As a county attorney, Streich is not a law enforcement officer, and he does not directly participate in investigations conducted by law enforcement officers and/or NDHHS caseworkers. (*Id.*)

12.    Streich does not oversee, supervise or control the Brown County Sheriff's Office or its members, and he does not instruct or direct the members of the Sheriff's Office as to how they should conduct investigations; but he does provide the members of that office with legal advice as they may request. (*Id.*)

13.    On April 29, 2003, Hapner was contacted by caseworker Doug Stanton ("Stanton") of the NDHHS. (Attach. 1, at CM/ECF p. 4; Attach. 3, at CM/ECF p. 4.)

14.    Stanton advised Hapner that NDHHS had received an intake report of alleged abuse or neglect of Alice Fletcher regarding a burn on her chest. (Attach. 1, at CM/ECF p. 4; Attach. 3, at CM/ECF p. 4.)

15.    Stanton advised Hapner that he was going to check on the condition of Alice Fletcher at the Aliene Clark ("Clark") residence in Ainsworth, and he requested that Hapner accompany him to Clark's property for that purpose. (Attach. 1, at CM/ECF p. 4.)

16.    Stanton advised Hapner that he was requesting that the Sheriff accompany him to investigate the report because there were concerns about reported threats made by Fletcher to employees of the Department. (Attach. 1, at CM/ECF pp. 3-4; Attach. 3, at CM/ECF p. 5.)

17.    When Hapner and Stanton arrived at Clark's home, where Alice Fletcher was present, Clark gave them consent to enter her residence. (Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF pp. 2-3, 7-8, 10; Attach. 5, at CM/ECF pp. 5, 9.)

18.    Clark returned Alice Fletcher to Plaintiff that evening in Valentine, and at that time Plaintiff told her that she should not have let Hapner and Stanton come in the house. (Attach. 5, at CM/ECF p. 12.)

19.    Clark decided to allow Hapner and Stanton to come into her residence to see that Alice had not been abused, and that is why she let them into the house to examine Alice. (*Id.*)

20.    Clark is the owner of the property at 534 N. Oak Street in Ainsworth, Brown County, Nebraska, which Hapner and Stanton entered on April 29, 2003, as a part of their investigation of the child abuse report regarding Alice Fletcher. ( *Id.* at CM/ECF pp. 2-3; Attach 1, at CM/ECF p. 3; Attach. 3, at CM/ECF pp. 14-15.)

21.     Stanton was introduced to Clark at her home, and Stanton interviewed Clark and explained that he was there to investigate the report of a burn mark on Alice.  (Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 9; Attach. 5, at CM/ECF pp. 4-6.)

22.     Clark personally raised Alice's shirt and showed Hapner and Stanton a mark under her left nipple which appeared to be a red mark measuring approximately 1/8 inch by 5/8 inch.  The mark appeared to Hapner to be old and not fresh.  (Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 9; Attach. 5, at CM/ECF pp. 6-8.)

23.     Clark explained that the injury occurred while the child was with her mother. She said that the baby had burned herself on a light bulb while Alice's mother was caring for her and was sleeping.  (Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 11; Attach. 5, at CM/ECF p. 6.)

24.     Streich had no involvement in, or discussions regarding, the investigation of the reported child abuse concerning Alice Fletcher that occurred on April 29, 2003 at the Clark residence.  (Attach. 2, at CM/ECF pp. 2-3; Attach. 1, at CM/ECF pp. 5-6.)

25.     Fletcher was not present at the premises of Clark's residence at any time on April 29, 2003, when Hapner and Stanton were present.  (Attach. 4, at CM/ECF p. 2.)

26.     Brown County has created a Child Abuse and Neglect Investigation and Treatment Team which has adopted a model protocol for the investigation of child abuse and neglect cases that has been prepared by the Nebraska Commission for the Protection of Children. This protocol was adopted by Brown County on October 5, 1994, and has been in place in Brown County since that time.  (Attach. 1, at CM/ECF p. 2.)

27.     When a child abuse or neglect report is received by the Brown County Sheriff's Office, the report is typically referred to the Nebraska Department of Health and Human Services, and the Sheriff's Office attempts to coordinate with the NDHHS caseworker the investigation of the report, as provided by Neb. Rev. Stat. §28-713 (Reissue 1995).  (*Id.*)

28.     As required by §28-713 when a written or verbal report of child abuse and/or neglect is received by the Brown County Sheriff's Office, it is promptly investigated, and, if appropriate, immediate steps are taken to protect the child.  (*Id.*)

29.     When NDHHS receives a report of child abuse or neglect in Brown County, the caseworker will often contact the Sheriff's Office and request assistance in investigating that report, and when requested, the Sheriff's Office will assist the Department in investigating such reports as provided by §28-713.  (*Id.*)

30.     The Nebraska Juvenile Code provides in §43-248(3) that a juvenile may be taken into temporary custody by any officer without a warrant or order of any court when the juvenile is seriously endangered in his or her surroundings and it appears that immediate removal is necessary for the juvenile's protection.  (*Id.*)

31.     Hapner understands §43-248(3) to give a law enforcement officer authority to take a juvenile into custody whenever the officer has reasonable grounds to believe that it is immediately necessary to protect the juvenile from serious harm, without a warrant or court order.  However, he recognizes that this authority is also subject to the Fourth Amendment to the U.S. Constitution which protects people from unreasonable searches and seizures.  (*Id.*)

32.     On April 29, 2003, Hapner was not aware of any court decision in this jurisdiction which required an officer to obtain a warrant before entering private property to investigate a report of child abuse or neglect.  (*Id.* at CM/ECF p. 3.)

33.    When entering private property for the purpose of investigating a report of child abuse or neglect, it is the policy of the Sheriff's Office to attempt to obtain consent to enter the premises from the owner or individual in possession or control of the property.  (*Id.*)

34.    In the event that consent cannot be obtained to enter on the property in order to conduct a child abuse or neglect investigation, a member of the Sheriff's Office would likely consult with the caseworker and county attorney to determine whether to seek a warrant or court order or take other action, unless there were reasonable grounds to believe that it was immediately necessary to enter the property to protect a child who is believed to be seriously endangered.  (*Id.*)

35.    Hapner had seen Clark at her residence on numerous occasions prior to April 29, 2003, and was aware that she frequently provided care to Fletcher's daughter, Alice Fletcher, at that residence.  (*Id.*)

36.    It was Hapner's understanding that Fletcher stayed at his mother's residence at various times, but that this was not his residence.  (*Id.*)

37.    As of April 29, 2003, neither the Brown County Sheriff's Office, Hapner or any other member in the office had been informed by Clark, Fletcher or any other person that they were not allowed on the Clark property at 534 N. Oak Street in Ainsworth, Brown County, Nebraska.  (*Id.*)

38.    As of April 29, 2003, neither the Brown County Sheriff's Office, Hapner or any other officer in the Sheriff's Office had been advised by Fletcher, Clark or any other person that they were not to inspect or examine Alice Fletcher in regard to any potential child abuse or neglect report that might be received regarding Alice Fletcher.  (*Id.* at CM/ECF pp. 3-4.)

11

39.     On the morning of April 29, 2003, Hapner was invited to Clark's residence by Clark to deal with a matter that was unrelated to the child abuse investigation.  (*Id.* at CM/ECF p. 4.)

40.     Hapner responded to Clark's request and went to her residence, where she invited Hapner to enter, and he dealt with the matter at her request.  (*Id.*)

41.     While Hapner was at the Clark residence on the morning of April 29, 2003, he observed that Alice Fletcher was in the home and was being cared for by Clark.  (*Id.*)

42.     It is Hapner's belief that he acted properly and carried out his duties as required by Nebraska law in the investigation of the child abuse report regarding Alice Fletcher on April 29, 2003, and in his contact and communications with Clark and Alice Fletcher that day.  (*Id.* at CM/ECF p. 6.)

43.     There have been cases in which children have been removed from the homes of their parents, guardians or custodians in Brown County, and in these cases the children were removed either at the request of their parents who reported that they were unable to parent and control their children, or because there were reasonable grounds to believe that the juveniles were seriously endangered in their home, and that immediate removal appeared necessary for the protection of the children as authorized by Neb. Rev. Stat. §43- 248 (Reissue 2004). (Attach. 2, at CM/ECF p. 4.)

44.     There is no policy, custom or practice in Brown County to engage in unreasonable searches of property in violation of the Fourth Amendment to the U.S. Constitution.  (*Id.*)

45.     When law enforcement officers and/or NDHHS caseworkers find it necessary to remove children from their homes in Brown County, they attempt to

12

obtain access to the property either by the consent of the owner or person in control of the property or pursuant to a court order or search warrant, unless exigent circumstances exist that justify an entry onto the premises without consent or other legal process. (*Id.*; Attach. 1, at CM/ECF p. 3.)

The Cherry County Defendants

46.    Joe Kreycik ("Kreycik") is a Deputy Sheriff in the Cherry County Sheriff's Office and has held this position for the last seventeen years. (Filing No. 206, Attach. 2, at CM/ECF p. 1.)[5]

47.    Kreycik has been certified by the Law Enforcement Training Center in Grand Island, Nebraska, following completion of the basic class and passing the examination. He is also certified as a law enforcement supervisor/manager. (*Id.*)

48.    Kreycik has participated in ongoing continuing legal education training throughout his career in law enforcement. (*Id.*)

49.    The policies and procedures of the Cherry County Sheriff's Office are determined by Sheriff Melvin Christensen ("Christensen"). (*Id.*; Attach. 1, at CM/ECF pp. 1-2.)

50.    When a child abuse or neglect report is received by the Sheriff's Office, contact is typically made by an officer with the Nebraska Department of Health and Human Services, and there is an attempt to coordinate with the NDHHS caseworker the investigation of the report as provided by Neb. Rev. Stat. §28-713 (Reissue 1995). (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF p. 2.)

---

[5]All "attachment" citations in this section are to Filing No. 206, the Cherry County Defendants' Index of Evidence.

13

51.    When a call reporting abuse and/or neglect of a child is received by the Cherry County Sheriff's Office, it is promptly investigated and immediate steps are taken as are deemed appropriate to protect the child if there are reasonable grounds to believe that the child has been abused and/or neglected, as required by §28-713. (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF p. 2.)

52.    Often when the Nebraska Department of Health and Human Services receives a report of child abuse or neglect in Cherry County, the caseworker will contact the Sheriff's Office and request assistance in investigating that report, and when requested, the Sheriff's Office will assist the Department in investigating such reports as provided by §28-713.  (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF p. 2.)

53.    When entering private property for the purpose of investigating a report of child abuse or neglect, it is the policy of the Sheriff's Office to attempt to obtain consent to enter the premises from the owner or individual in possession or control of the property.  (Attach. 1, at CM/ECF pp. 2-3; Attach. 2, at CM/ECF p. 2.)

54.    In the event that consent to search or enter private property is refused, the officer would normally consult with the caseworker and the county attorney to determine whether to seek a warrant or court order, or take other action, unless there were reasonable grounds to believe that it was immediately necessary to enter the property to protect a child who was believed to be serious endangered.  (Attach. 1, at CM/ECF p. 3; Attach. 2, at CM/ECF p. 2.)

55.    Christensen and Kreycik were aware that the Nebraska Juvenile Code provides in §43-248(3) that a juvenile may be taken into temporary custody by any officer without a warrant or order of any court when the juvenile is seriously endangered in his or her surroundings and it appears that immediate removal is

14

necessary for the juvenile's protection.  (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF p. 2.)

56.    Christensen and Kreycik understand that §43-248(3) gives a law enforcement officer authority to take a juvenile into custody whenever the officer has reasonable grounds to believe that it is immediately necessary to protect the juvenile from serious harm, without a warrant or court order.  However, they are aware that this authority is also subject to the Fourth Amendment to the U.S. Constitution which protects people from unreasonable searches and seizures.  (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF pp. 2-3.)

57.    As of September 16, 2005, Christensen and Kreycik were not aware of any court decision in this jurisdiction which required an officer to obtain a warrant before entering private property to investigate a report of child abuse or neglect. (Attach. 1, at CM/ECF p. 2; Attach. 2, at CM/ECF p. 3.)

58.    Neither the Cherry County Sheriff's Office, Christensen, Kreycik, or any other member of the Office had been informed by Fletcher or any other person that they were not to go onto the premises of Fletcher's body shop business in Valentine, Nebraska.  (Attach. 1, at CM/ECF p. 3; Attach. 2, at CM/ECF p. 3.)

59.    As of September 16, 2005, neither the Cherry County Sheriff's Office, Christensen, Kreycik or any other officer in the Office had been advised by Fletcher or any other person that they were not to inspect or examine Alice Fletcher in regard to any potential child abuse or neglect report that might be received regarding Alice Fletcher.  (Attach. 1, at CM/ECF p. 3; Attach. 2, at CM/ECF p. 3.)

60.    On September 16, 2005 at 11:16 a.m., the Cherry County Sheriff's Office received notice from the Nebraska Department of Health and Human Services that the

Department had received a report of an allegation of child abuse in Cherry County. (Attach. 2, at CM/ECF p. 3.)

61.    The notice advised that the case had been assigned as a Priority 1, which meant that it was assigned a high priority.  (*Id.*; Attach. 4, at CM/ECF p. 12.)

62.    The notice further advised that Fletcher was the subject of the report, and Kreycik was informed that two separate reports had been received that Fletcher had physically abused his minor child in separate incidents by disciplining her excessively in public.  (Attach. 1, at CM/ECF p. 3; Attach. 4, at CM/ECF pp. 2-3, 12-13.)

63.    The information provided by the Department of Health and Human Services on the report advised that Fletcher lived at Beaver Lake in Cherry County, Nebraska.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF p. 7.)

64.    Beaver Lake is located outside the city limits of Valentine.  (Attach. 4, at CM/ECF p. 7.)

65.    Kreycik was on duty at the time that the report was received by the Sheriff's Office, and he responded to it by contacting the local office of the Nebraska Department of Health and Human Services.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF pp. 3-4.)

66.    Kreycik requested that a female child protective service worker accompany him to check on the welfare of the child.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF pp. 5-6.)

67.    Kreycik then contacted the Nebraska State Patrol and requested that a trooper be assigned to assist as backup for the response to the child abuse report in

16

Beaver Lake, in rural Cherry County.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF p. 29.)

68.     Kreycik believed that Fletcher would likely be found at a body shop where he was known to work in the City of Valentine, so he contacted Ben McBride ("McBride"), the Valentine Police Chief, regarding the child abuse report.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF p. 9.)

69.     McBride and Kreycik agreed that if Fletcher and Alice Fletcher were present at the body shop in the City of Valentine, McBride would serve as the primary officer since the matter was within the City's jurisdiction, and Kreycik would provide backup assistance to McBride.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF pp. 7-9.)

70.     McBride asked Kreycik to bring the protective service worker, Prairey Walkling ("Walkling"), to the body shop.  (Attach. 2, at CM/ECF p. 4.)

71.     Kreycik picked up Walkling at the Valentine NDHHS Office the afternoon of September 16, 2005, and proceeded with her to the Heartland Auto and Glass business where he believed that Fletcher and Alice Fletcher would be located.  (*Id.*; Attach. 4, at CM/ECF p. 10.)

72.     Kreycik and Walkling arrived at the business at 2:08 P.M., and Kreycik observed that McBride was already present on the premises.  (Attach. 2, at CM/ECF p. 4; Attach. 4, at CM/ECF pp. 8, 10.)

73.     Kreycik parked his vehicle in the parking lot and walked into the office area followed by Walkling, who was carrying a camera and notepad. The parking lot was open and there was no enclosed fence or gate surrounding the lot.  (Attach. 2, at CM/ECF p. 4.)

17

74.   When Kreycik arrived at the body shop, Walkling and Kreycik walked into the office and saw that McBride was already present and talking with Fletcher. (*Id.* at CM/ECF pp. 4-5; Attach. 4, at CM/ECF p. 11.)

75.   Fletcher did not tell Kreycik to leave, nor did he object to his presence at the business. (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF pp. 14-15.)

76.   Fletcher also did not tell Walkling to leave or object to her presence until he confronted her sometime later. (Attach. 2, at CM/ECF p. 5.)

77.   When Kreycik arrived on the property he heard McBride discussing with Fletcher vandalism that had occurred at Fletcher's property. (*Id.*; Attach. 4, at CM/ECF p. 15.)

78.   Plaintiff and McBride walked out of the office into the back (north) area of the property and Kreycik followed them. Walkling remained near the office area in the south end of the shop. (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF pp. 16-19.)

79.   Fletcher proceeded to show McBride property that had been vandalized in the yard of his body shop, and Kreycik did not observe Walkling and Alice Fletcher after Plaintiff, McBride and Kreycik walked out into the yard. (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF pp. 18-19.)

80.   After being in the yard for a short time, Plaintiff realized that his daughter was not there and he went back to the office to look for her. Kreycik followed Plaintiff back to the office and McBride was behind Kreycik. (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF p. 19.)

18

81.    When Plaintiff arrived at the office he ran up the stairs. He then went to a room and saw Alice in the upstairs room with Walkling.  Fletcher then began to walk back down the stairs.  (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF pp. 19-20.)

82.    As Plaintiff came back down the stairs, he noticed Walkling's camera sitting on one of the bottom stairs, and he got very angry.  (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF p. 20.)

83.    Plaintiff then turned around and quickly went back up the stairs, and Kreycik followed him.  (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF p. 21.)

84.    Plaintiff then walked into the room and grabbed ahold of his daughter. At that time Kreycik was standing at the entry to the room and could observe Plaintiff inside the room with his daughter and also Walkling to be present there.  (Attach. 2, at CM/ECF p. 5; Attach. 4, at CM/ECF pp. 23, 26.)

85.    Plaintiff asked Walkling, "What the hell are you doing?" At that time Walkling quickly left the room to avoid the confrontation with Fletcher, and Kreycik blocked Plaintiff from having contact with her.  (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF pp. 23, 26.)

86.    Walkling then quickly went down the stairs and left the building. (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF pp. 23, 26.)

87.    Plaintiff yelled at Kreycik and told him to, "Get the hell out!"  Kreycik refused to leave the property until he could confirm that Walkling had determined that Alice Fletcher was not in danger.  (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF pp. 23, 25.)

19

88.     Kreycik told McBride to check with Walkling to find out if she had observed any evidence of abuse to indicate that Alice was in danger.  (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF p. 23.)

89.     McBride then left and after conferring with Walkling returned and informed Kreycik that Walkling told him that she did not see any signs of abuse and did not feel that Alice was in danger.   (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF pp. 23-25.)

90.     Kreycik had understood that the reports of the alleged child abuse had indicated that Alice Fletcher had been struck in the area of her lower back. (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF p. 24.)

91.     Plaintiff continued to yell at Kreycik and call him obscene names. Kreycik tried to calm him and explain that they had an obligation to make sure that his daughter was not in danger, but he remained irate, and Kreycik then left the property. (Attach. 2, at CM/ECF p. 6.)

92.     Kreycik did not remove Alice Fletcher from Plaintiff's care, nor did he ever seize her or take her into temporary custody. (*Id.*)

93.     Kreycik did not remove any evidence or seize any property from the premises of Plaintiff's business. (*Id.*)

94.     Kreycik believed that Fletcher consented to his presence on the property as Fletcher observed Kreycik to walk onto the premises, was aware of his presence, and did not object until after Fletcher confronted Walkling. (*Id.*)

95.     Kreycik did not immediately leave after Plaintiff objected to his presence on the premises, because he felt it was his duty to confirm that the child was not in

danger. Once he obtained this confirmation, he left the property. (*Id.*; Attach. 4, at CM/ECF p. 25.)

96.     Kreycik did not remain on the property for more than a few minutes after Plaintiff told him to leave, until McBride confirmed to him that Walkling had informed McBride that Alice Fletcher did not show signs of abuse and was not in danger. (Attach. 2, at CM/ECF p. 6.)

97.     There was no criminal action or juvenile court proceedings that were filed as a result of this incident. (*Id.*)

98.     At no time prior to going to Plaintiff's body shop in Valentine in September 16, 2005, did Kreycik speak with Eric Scott ("Scott"), the Cherry County Attorney, about the matter, nor did he discuss with Scott his intention to go to Fletcher's business with Walkling or McBride to participate in an investigation of a child abuse report. (*Id.* at CM/ECF p. 7; Attach. 4, at CM/ECF pp. 26-28; Attach. 3, at CM/ECF pp. 1-2.)

99.     Scott was not aware that Walkling, McBride and Kreycik were going to proceed to Plaintiff's place of business on September 16, 2005 to investigate the child abuse report regarding Alice Fletcher. (Attach. 3, at CM/ECF pp. 1-2; Attach. 2, at CM/ECF p. 7.)

100.    Kreycik has not engaged in any effort to enter or gain access for others into Plaintiff's property to investigate allegations of child abuse at any time other than on September 16, 2005, when he entered Plaintiff's business property with caseworker Walkling. (Attach. 2, at CM/ECF p. 7.)

101.    To the best of Kreycik's knowledge and belief, he acted properly and carried out his duties as required by Nebraska law to assist in the investigation of the

21

child abuse report regarding Alice Fletcher on September 16, 2005, and in his contact with Plaintiff that date.  (*Id.*)

102.   Scott is the Cherry County Attorney and has served in this capacity since January of 1999.  (Attach. 3, at CM/ECF p. 1.)

103.   At some point after McBride, Kreycik and Walkling went to Plaintiff's business on September 16, 2005, Scott was advised of the contact between said individuals and Plaintiff.  (*Id.* at CM/ECF p. 2.)

104.   Scott does not oversee, supervise or control the Cherry County Sheriff's Office or its members, and he does not instruct or direct the members of the Sheriff's Office as to how they should conduct investigations; but he does provide the members of that office with legal advice as they may request.  (*Id.*)

105.   Scott is not a law enforcement officer and he does not establish policy for Cherry County in regard to searches of persons or property.  (*Id.*)

106.   Scott did not engage in any efforts to seek to gain access to or entry upon property of Plaintiff regarding the allegations of child abuse that were investigated by McBride, Kreycik and Walkling on September 16, 2005.  (*Id.*)

107.   Scott does not authorize or direct law enforcement officers or NDHHS personnel to engage in searches of private property in violation of the Fourth Amendment to the U.S. Constitution, nor has he done so in the past.  (*Id.* at CM/ECF p. 3.)

108.   It is the policy of the Cherry County Attorney's Office to file actions when authorized by the Nebraska Juvenile Code to obtain the jurisdiction of the juvenile court over children who fall within the provisions of §43-247, and to seek

the removal of children who are endangered in their homes through appropriate legal proceedings as authorized by Nebraska law.  (*Id.*)

109.   There have been cases in which children have been removed from the homes of their parents, guardians or custodians in Cherry County, Nebraska, and in these cases the children have been removed either at the request of their parents who reported that they were unable to parent and control their children, or because there were reasonable grounds to believe that the juveniles were seriously endangered in their home, and that immediate removal appeared necessary for the protection of the juveniles as authorized by Neb. Rev. Stat. §43-248 (Reissue 2004).  (*Id.*)

110.   There is no policy, custom or practice in Cherry County to engage in unreasonable searches of private property in violation of the Fourth Amendment to the U.S. Constitution.  (*Id.*; Attach. 1, at CM/ECF pp. 2-3.)

111.   When law enforcement officers and/or NDHHS caseworkers find it necessary to remove children from their homes in Cherry County, they attempt to obtain access to the property either by consent of the owner or person in control of the property or pursuant to a court order or search warrant, unless exigent circumstances exist that justify an entry onto the premises without consent or other legal process.  (Attach. 3, at CM/ECF p. 3; Attach. 1, at CM/ECF pp. 2-3.)

112.   When a report of an incident that occurs in the City of Valentine is received by the Sheriff's Office, contact is made with the Valentine Police Department as that Department has primary jurisdiction over matters that occur within the City of Valentine.  The Sheriff's Office will typically provide backup assistance to the Valentine Police Department for matters that are investigated in the City of Valentine, as the Valentine Police Department has primary jurisdiction over incidents that occur within the City.  (Attach. 1, at CM/ECF p. 4; Attach. 2, at CM/ECF p. 4.)

## III.   ANALYSIS

### A.   Standard of Review

Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c). *See also Egan v. Wells Fargo Alarm Servs.*, 23 F.3d 1444, 1446 (8th Cir. 1994).  It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue. *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).  In passing upon a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the motion. *Dancy v. Hyster Co.*, 127 F.3d 649, 652 (8th Cir. 1997).

In order to withstand a motion for summary judgment, the nonmoving party must substantiate their allegations with "'sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles County*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment."  *Id.*  Essentially the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.   Claims Against Defendants in their Individual Capacities

Plaintiff brought his claims against Defendants in their individual capacities. Defendants argue that summary judgment in their favor is appropriate because Defendants are entitled to qualified immunity.  As set forth in the court's previous

24

Memorandum and Order (filing no. 72), qualified immunity shields governmental officials from personal liability if their actions, even if unlawful, were nevertheless objectively reasonable in light of the clearly established law at the time of the events in question. *Anderson v. Creighton*, 483 U.S. 635, 638-41 (1987). Public officials are entitled to qualified immunity in suits against them in their individual capacity as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In short, "qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful in light of clearly established law and the information [that the defendant] possessed . . . . The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations and quotations omitted). Moreover, qualified immunity is "the usual rule" and state actors will enjoy qualified immunity in all but "exceptional cases." *Foy v. Holston*, 94 F.3d 1528, 1532 (11th Cir. 1996).

### 1.    The County Attorney Defendants

The evidence is undisputed that neither Defendant Scott nor Defendant Streich had any involvement in or discussions regarding, the investigations of the reported child abuse concerning Plaintiff's daughter. (Filing No. 202, Attach. 2, at CM/ECF pp. 2-3; Attach. 1, at CM/ECF pp. 5-6.; Filing No. 206, Attach. 3, at CM/ECF pp. 1-2.) These Defendants are not law enforcement officers and are not responsible for establishing policies relating to searches for either Brown or Cherry County, Nebraska. Rather, these Defendants provide legal advice to law enforcement officers. (Filing No. 202, Attach. 2, at CM/ECF p. 1; Filing No. 206, Attach. 3, at CM/ECF pp. 1-2.) Because Defendants Scott and Streich had no involvement in the events underlying Plaintiff's claims, the claims against these two Defendants in their individual capacities are dismissed with prejudice.

25

2.      Deprivation of a Constitutional Right

The first task of a "court evaluating a claim of qualified immunity" is to "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all . . . ." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  Plaintiff alleges violations of his Fourth and Fourteenth Amendment rights relating to the search of his daughter, Alice. (Filing No. 80 at CM/ECF pp. 3-4.)  Regardless of the label, "the same basic analysis" applies to both claims.  *Darryl H. v. Coler*, 801 F.2d 893, 901 n. 7 (7th Cir. 1986) (stating that, for fourteenth amendment inquiries, "a court must essentially weigh the privacy interest of the family member against the interests of the government" and that "[t]he same basic analysis is utilized under the fourth amendment").  Here, there is simply no constitutional injury.

As Plaintiff has previously been advised by the court, Fourth Amendment rights of a child cannot be asserted by a non-attorney parent proceeding pro se. *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59 (2d Cir. 1990); *accord Devine v. Indian River County School Bd.*, 121 F.3d 576 (11th Cir. 1997); *Johns v. County of San Diego*, 114 F.3d 874 (9th Cir. 1997); *Osei-Afriyie v. Med. College of Pa.*, 937 F.2d 876 (3d Cir. 1991).  Further, where a search is conducted pursuant to consent, a parent has no individual Fourth Amendment claim stemming from the search of a child's person.  *Roe v. Texas Dep't of Protective and Regulatory Servs., Inc.*, 299 F.3d 395, 402 (5th Cir. 2002).

It is undisputed that the search in which the Brown County Defendants were involved was conducted pursuant to the express consent of Plaintiff's mother, the owner of the residence.  (Filing No. 202, Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 9; Attach. 5, at CM/ECF pp. 4-6.)  Further, Plaintiff's mother consented to and assisted in the search without any coercion by the Brown County Defendants. (Filing No. 202, Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 9; Attach. 5, at CM/ECF pp. 6-8.)  Thus, the search by the Brown County Defendants was undertaken

26

pursuant to consent and Plaintiff therefore has no individual Fourth Amendment claim.

It is questionable whether the search in which the Cherry County Defendants were involved was undertaken pursuant to consent. Although Plaintiff allowed Defendant Kreycik onto his property and around his daughter, Plaintiff later objected to Kreycik's presence on the property. (Attach. 2, at CM/ECF p. 6; Attach. 4, at CM/ECF pp. 23, 25.) Regardless, Kreycik was not involved in the search of Plaintiff's daughter, and did nothing more than create a diversion so that the NDHHS worker could perform her work. At most, Kreycik entered onto Plaintiff's property pursuant to Plaintiff's consent, which was later withdrawn. When that consent was withdrawn, Kreycik left Plaintiff's property. Kreycik did not participate in the search and was there merely as "back up." (Attach. 1, at CM/ECF p. 4; Attach. 2, at CM/ECF p. 4.) Plaintiff has not established a constitutional violation.

### 3.   Clearly Established Right

Even if Plaintiff can establish that a constitutional right was violated by Defendants, he must also prove that the right was "clearly established" at the time of the searches. As set forth in the court's previous Memorandum and Order (filing no. 72), "a parent's interest in the custody of a child is a constitutionally protected liberty interest subject to due process protection. It is well-established that parents have a fundamental, constitutionally protected liberty interest in the custody of their children." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 103-04 (2d Cir. 1999), cert. denied, 528 U.S. 1155 (2000) (quotations omitted); *see also Manzano v. South Dakota Dept. of Social Services*, 60 F.3d 505, 509 (8th Cir. 1995).

However, the right to family integrity, that is, a parent's right to the care, custody and management of their children, is not absolute and is limited by the compelling governmental interest in the protection of minor children. *Manzano*, 60

27

F.3d at 509-510.  Indeed, the right to family integrity has been characterized by the First Circuit as "a parent's right to custody in the absence of a case worker's reasonable suspicion of child abuse."  *Hatch v. Department for Children, Youth and Their Families*, 274 F.3d 12 (1st Cir. 2001).  The need to balance these competing interests to determine the legality of the investigator's conduct usually means that the parent's asserted right cannot be considered clearly established in the context of a child abuse investigation.  *See, e.g., Foy v. Holston*, 94 F.3d at 1535 n.8 (11th Cir. 1996) ("When the law contemplates some kind of balancing test to determine the ultimate question of lawfulness or unlawfulness of an act, qualified immunity almost always applies to shield the public servant defendant.").  Thus, whatever rights a parent has to be free from an alleged unreasonably conducted investigation regarding suspected child abuse, such rights are not clearly established.  As set forth in *Foy*, "state officials who act to investigate or to protect children where there are allegations of abuse almost never act within the contours of 'clearly established law.'"  *Id.* at 1537.

The Eighth Circuit has stated the rule regarding qualified immunity in child abuse investigation cases simply:

> [W]hen a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is properly founded upon a reasonable suspicion of child abuse.

*Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) (citations omitted).  As long as police officers "were within the confines of" the child abuse investigations, qualified immunity will apply.  *Id.*  The undisputed evidence here shows that the searches clearly took place within the confines of two separate reports of child abuse by Plaintiff.  (Filing No. 202, Attach. 1, at CM/ECF p. 5; Attach. 3, at CM/ECF p. 9; Attach. 5, at CM/ECF pp. 4-8; Filing No. 206, Attach. 1, at CM/ECF p. 3; Attach. 4, at CM/ECF pp. 3-4, 7, 12-13.)  Because Plaintiff has not shown that Defendants

28

violated any clearly established rights during the child abuse investigations, Defendants are entitled to qualified immunity.

### 4.    Claims for Injunctive Relief

Qualified immunity does not foreclose a plaintiff's request for injunctive relief. Plaintiff requests that the court enjoin Defendants "from further acts depriving Plaintiffs and others of their civil rights and from subjecting Plaintiffs to further illegal and unconstitutional searches." (Filing No. 80 at CM/ECF p. 7.) However, "[b]road language in an injunction that essentially requires a party to obey the law in the future is not encouraged and may be struck from an order for injunctive relief, for it is basic to the intent of Rule 65(d) that those against whom an injunction is issued should receive fair and precisely drawn notice of what the injunction actually prohibits." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444 (1974). Thus the court cannot and will not issue an injunction requiring Defendants to do nothing more than "obey the law." Plaintiff's request for injunctive relief is inappropriate and Defendants are entitled to summary judgment on Plaintiff's claims for injunctive relief as well.

### C.    Claims Against Defendants in their Official Capacities

Plaintiff also sued all Defendants in their official capacities. However, claims against a public employee in his or her official capacity is actually a suit against the public employer. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Eagle v. Morgan*, 88 F.3d 620, 629 n. 5 (8th Cir. 1996) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Therefore, Plaintiff's claims against Defendants Hapner, Streich, Scott, and Kreycik in their official capacities are actually claims against Brown County and Cherry County and the court addresses them as such.

A county may only be liable under section 1983 if its "policy" or "custom" caused a violation of the plaintiff's constitutional rights. *Doe By and Through Doe v. Washington County*, 150 F.3d 920, 922 (8th Cir. 1998) (citing *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694 (1978)). An "official policy" involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy. *Jane Doe A By and Through Jane Doe B v. Special School Dist. of St. Louis County*, 901 F.2d 642, 645 (8th Cir.1990) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

To establish the existence of a governmental custom, a plaintiff must prove:

1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) That plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation.

*Jane Doe*, 901 F.2d at 646. In short, a plaintiff must show that there was a constitutional injury and that the injury was caused by a policy or custom of the defendants.

Even if Plaintiff could establish that his constitutional rights were violated, which the court takes as true for purposes of this analysis,[6] Plaintiff has presented no

---

[6]As set forth above, Plaintiff has not established that any of his constitutional rights were violated.

evidence that either Brown County or Cherry County had an official policy or custom which led to that violation.  Plaintiff alleges that Brown County and Cherry County had official policies or customs in place which permitted or required their employees to enter property for NDHHS child abuse investigations without search warrants and without probable cause.  (Filing No. 80 at CM/ECF pp. 4, 6.)  The undisputed evidence shows that no such policy or custom was in place.

To the contrary, both Brown County and Cherry County had policies which stated that, when law enforcement officers and/or NDHHS caseworkers find it necessary to remove children from their homes in Brown County, they attempt to obtain access to the property either by the consent of the owner or person in control of the property or pursuant to a court order or search warrant.  (Filing No. 202, Attach. 2, at CM/ECF p. 4; Attach. 1, at CM/ECF p. 3; Filing No. 206, Attach. 3, at CM/ECF p. 3; Attach. 1, at CM/ECF pp. 2-3.)  These policies were in place unless exigent circumstances existed which justified entry onto a premises without consent or other legal process.  (Filing No. 202, Attach. 2, at CM/ECF p. 4; Attach. 1, at CM/ECF p. 3; Filing No. 206, Attach. 3, at CM/ECF p. 3; Attach. 1, at CM/ECF pp. 2-3.)  In short, Plaintiff has shown no policy, custom or practice in Brown County or Cherry County, Nebraska which permitted or required Defendants to engage in unreasonable searches of property in violation of the Fourth Amendment to the U.S. Constitution.  Therefore, summary judgment in favor of Defendants in their official capacity is warranted.

IT IS THEREFORE ORDERED that:

1.    Defendants Cherry County, Eric Scott, and Joe Kreycik's Motion for Summary Judgment (filing no. 204) is granted.  All claims against these Defendants are dismissed with prejudice.

2.     Defendants Brown County, David Streich, and Steve Hapner's Motion for Summary Judgment (filing no. 200) is granted.   All claims against these Defendants are dismissed with prejudice.

3.     Plaintiff's Motion for Summary Judgment (filing no. 247) is stricken.

4.     Defendants' Motion to Strike Index (filing no. 252) is granted in accordance with this Memorandum and Order.

5.     A separate judgment in accordance with this Memorandum and Order will be entered.

March 18, 2008.                    BY THE COURT:

                                   s/ Joseph F. Bataillon
                                   Chief United States District Judge